IN THE MATTER OF THE APPLICATION FOR DISBAR-
MENT OF CHARLES L. CRUM, OF BISMARCK, NORTH
DAKOTA, a Member of the Bar of This Court, and to Revoke
the Certificate Issued to Him by This Court.

(— A.L.R. —, 215 N. W. 682.)

**Attorney and client — attorney acting as prosecuting officer — accepting
money knowing same intended to influence him — grounds for disbar-
ment.**

1. The acceptance of money by an attorney, when acting as a prosecuting
officer, knowing that such money was intended to influence him in the prosecu-
tion of a criminal action, is a willful violation of his duties as an attorney at
law and is ground for disbarment.

**Bribery — attorney acting as prosecuting attorney accepting money to in-
fluence him in duty — bribery.**

2. Where money is offered and received as a campaign contribution, with
the intent to influence the prosecuting officer in the prosecution of a criminal
action, it is nevertheless bribery. It is not the use to which the money is put,
but the purpose for which it is paid, that controls.

**Attorney and client — disbarment proceeding — receiving money knowing
same was intended to influence him.**

3. In a disbarment proceeding where the undisputed evidence shows that
an attorney at law, appointed as an assistant attorney general to prosecute
a criminal action, receives by registered mail $700 in currency, and testifies
in his own behalf that when he was first called into the case the defendant
offered him $10,000 to keep him out of the penitentiary, that later the de-
fendant came to his office and asked him if he thought a contribution to
the recall campaign fund would help him, that a few days thereafter the de-
fendant came to his house and told him that he had concluded to make a
contribution to the recall campaign fund, and that sometime later he received
through the mail by registered letter the sum of $700 in currency and that he
turned the same over to the recall campaign fund, suspecting that the money
was sent by the defendant, to be used in his behalf for immunity, such evi-

Note.—(1) On right of prosecuting attorney to represent individuals having an
interest adverse to or dissociated from the public interest, see annotation in L.R.A.
1918F, 832.

dence is ample proof of conduct violative of the oath of office of the attorney and of a willful violation of the duties of an attorney at law.

Opinion filed October 19, 1927.

Attorney and Client, 6 C. J. § 60 p. 600 n. 83; § 93 p. 612 n. 52.

The prosecution, or State Bar Board, being represented by *John W. Carr,* Esq., and the accused being represented by *Scott Cameron,* Esq., *A. G. Divet,* Esq., *Arthur B. Atkins,* and *C Liebert Crum.*

BURKE, J. On January 22, 1924, this court had before it on demurrer the case of Janzen v. Crum, 50 N. D. 544, 197 N. W. 138.

The plaintiff claimed that the defendant, C. L. Crum, as an assistant attorney general, appointed to prosecute C. N. Janzen upon a charge of embezzlement, demanded of, and received from C. N. Janzen and Bertha Janzen the sum of $700 on a promise of immunity. The defendant demurred to the complaint, claiming that the agreement pleaded was void as against public policy and criminal.

This court rendered its opinion, holding such an agreement to be void. The matter, however, being before this court on a verified complaint, was referred to the bar board for investigation. The bar board thereafter reported to this court the substance of a deposition of C. N. Janzen, the defendant in the embezzlement case, and the substance of the testimony of Mr. Crum, and reported that "the admissions of the accused (Mr. C. L. Crum) are such, however, that they have served in the minds of the board rather to corroborate the testimony than to refute the same." Upon this report the court ordered formal charges to be filed and appointed Honorable A. G. Burr, Honorable Geo. M. McKenna and Honorable Geo. H. Moellring, three district judges, as referees. The referees took the testimony in said disbarment proceedings and made findings of fact and conclusions. The findings and conclusions of the referees are:

1

"That the respondent Charles L. Crum is and at all times hereinafter mentioned was an attorney and counselor at law, duly admitted to practice in the courts of the state of North Dakota.

2

"That on the 21st day of April, 1921 one C. N. Janzen was cashier of the Citizens State Bank of Hazen, N. D., and that on said date, the bank being involved in financial difficulties, the Attorney General of the state of North Dakota, Hon. Wm. Lemke, appointed the respondent, Charles L. Crum, who then maintained an office in the city of Mandan, N. D., as a Special Assistant Attorney General to investigate the affairs of the Hazen bank, particularly as to whether or not any criminal acts had been committed by any of the officers of the said bank and to prefer charges and prosecute any and all criminal charges brought against any of said officers.

3

"That on the said 21st day of April, 1921 the said Charles L. Crum and a deputy bank examiner examined the affairs of the Citizens State Bank of Hazen, N. D., and the bank was closed, and Charles L. Crum, as Special Assistant Attorney General, obtained from the cashier, C. N. Janzen a written confession admitting that the said Janzen had embezzled funds of the bank in the sum of $35,000; that a few days later at the instigation of the said Charles L. Crum, a criminal complaint was sworn to in justice court in Mercer county, N. D., by the receiver of the bank charging the said C. N. Janzen with the crime of embezzlement; that a warrant of arrest was issued and he was brought before a justice of the peace, for a preliminary hearing, his bail fixed in the sum of $5,000 was furnished and the preliminary hearing adjourned to the 24th day of June, 1921.

4

"That the said C. N. Janzen and Bertha Janzen, his wife, transferred to the officers of the Citizens State Bank of Hazen at the suggestion of the respondent, Charles L. Crum, all of their property including a deed to their home in Hazen.

5

"That in the summer or fall of 1926 said Charles L. Crum also brought suit for the Citizens State Bank of Hazen upon Janzen's bond and also brought certain attachment proceedings against the household goods and personal effects of the Janzens.

6

"That at the preliminary hearing of C. N. Janzen held in Mercer county about the 24th day of June, 1921, Mr. John Moses, State's Attorney of Mercer county represented the State, the respondent Charles L. Crum not being present. The defendant Janzen was not represented by counsel, but waived a preliminary hearing and was held to answer at the next term of the district court.

7

"That the criminal action against C. N. Janzen came before the district court at Stanton, Mercer county, N. D., about the 18th day of October, 1921; Mr. Janzen employed one Thorstein Hyland, a practicing attorney in the city of Mandan to appear for him at that time; affidavits of prejudice were filed against the court and the county and change of place of trial was granted to the city of Mandan in Morton county, N. D.

8

"The case came before the district court of Morton county, Judge Thomas H. Pugh, presiding, on the second day of November, 1921. Mr. Thorstein Hyland appeared for the defendant Janzen, Janzen entered a plea of guilty and was sentenced to four and one half years in the state penitentiary; that after serving 20 months his sentence was commuted by the state pardon board.

9

"That on the 21st day of April, 1921 at Hazen, N. D., and between that date and the 10th day of May, 1921 at Mandan, N. D., the said C. N. Janzen and the said Charles L. Crum had conversations relative to the payment of money by C. N. Janzen to Charles L. Crum for the purpose of influencing the action of the said Charles L. Crum in the prosecution of the embezzlement charge preferred against C. N. Janzen, by securing the discontinuance of said prosecution, and if this were not possible to secure delay in the prosecution of the said criminal charge, and if said Janzen were convicted and sentenced to have the said Charles L. Crum influence any and all other representatives of the state in the prosecution of said case in favor of the said C. N. Janzen; by shortening the time of sentence or securing pardon.

### 10

"That thereafter and before the first day of June, 1921 and while said prosecution was pending said C. N. Janzen sent by registered mail from Minneapolis, Minnesota, a registered package containing $700 in currency, addressed to Mr. Charles L. Crum, Mandan, N. D., with the name of one Julius Friesen in the upper left hand corner of the envelope and the postoffice address of Minneapolis, Minnesota, thereon; that this money was sent for the purpose of influencing Charles L. Crum as aforesaid. That there was no letter or other indication in the envelope as to the source from which the money came; that the said Charles L. Crum made no effort to ascertain who sent the money or for what purpose it was sent nor did he inform the Attorney General for whom he was working or any other person, of the receipt of said money; that the said Charles L. Crum knew from what source the money came and he knew that the said money was sent for the purpose hereinbefore stated of influencing him as aforesaid; that the said Charles L. Crum received and kept said money for his own use and for the said purpose for which it was sent and did delay said prosecution; that thereafter the said C. N. Janzen waived preliminary prosecution examination and the said Charles L. Crum took no further part in the prosecution of the said case for and on behalf of the State although he continued to be Special Assistant Attorney General for this case under his appointment as hereinbefore described.

### 11

"That thereafter and during the month of November 1921 said Charles L. Crum was confronted by the said Bertha Janzen the wife of the defendant, and she demanded the repayment of said money and the said Charles L. Crum denied receiving any money from the said C. N. Janzen or from any source on his behalf, and refused to return any of it except the sum of $25 which he claimed to have advanced to Bertha Janzen as a loan.

"The Referees made the following conclusions:

### 1

"That the said Charles L. Crum has been guilty of the crime of compounding a prosecution.

2

"That he has committed a misdemeanor involving moral turpitude.

3

"That he has been guilty of the wilful violation of his duties and his oath as an attorney and counselor at law and as a special assistant attorney general of the State of North Dakota.
"Dated March 18, 1927."

We have carefully read the record, and we think that the findings and conclusions of the referees are sustained by the evidence, except that the evidence does not show a protracted delay in the prosecution.

C. N. Janzen testified, that in April, 1921 he was cashier of the Citizens State Bank at Hazen, North Dakota, and that on the 20th day of April, 1921 Charles L. Crum, an assistant attorney general, was in Hazen in charge of a prosecution against Janzen for embezzlement. ". . . he told me that I was fortunate that he had been appointed on this case as somebody else might come up there and raise particular Cain . . . , but he said he was not going to do anything, at least not at that time, and he said that he did not think that I had to worry too much about it, things would come out all right. . . . He said he was going back to Bismarck and he did not think . . . I would be arrested. . . ." The witness stated that a day or two after he saw Mr. Crum "he said that he had been down to Bismarck, . . . but there would have to be some charges filed against me, but that I should not worry about that that matter could be handled all right. . . . and he said he would try and get the preliminary hearing put off as long as possible. . . . I saw him a few days later in Mandan, at his office, . . . I went to see him about this matter as he had suggested to me at Hazen. . . . He told me that this matter could be dragged along and get old, and finally drop, but it was going to take some money, and I asked him how much money it was going to take. He said it would take a couple of thousand dollars. . . . I told him I did not think it was possible for me to raise that much money. Well, he says, you raise what you can and send it to me and I will take care of the case for whatever you can send me. . . . I went to Minneapolis. . . . I borrowed five hundred dollars from my mother." "Q. You say you had

$200? A. Yes. . . . Q. You say that you sent $700 consisting of $500 obtained from your mother and $200 which you and your wife had, to Mr. Crum. How did you send that $700 to him? A. By registered mail. Q. You say that the envelope was registered? In whose name was it registered? A. Julius Friesen. Q. And who is he? A. He is my brother-in-law. Q. How did you come to register it in the name of Julius Friesen? A. So as not to make it appear that the instructions that Mr. Crum gave me. . . . He said that I should send it in currency, not send a draft or check, and not have my name appear on it at all in any shape or form. . . . Q. Did you tell Mr. Friesen the purpose for which you were obtaining the money? A. I told him. . . . Q. At about what date was this money sent to Mr. Crum? A. Either the latter part of April or the first part of May, 1921. . . . I asked him whether he had received the money I had sent. He said he had. He said that 'the money is working for you.' Q. Was that all that occurred at that conversation? A. I talked to him about having to appear at Hazen of course and asked him what to do, and he told me that I had better go up there and waive examination. . . . Q. Did you appear at the preliminary hearing at Hazen? A. Yes. . . . Q. When was the next conversation? A. In October. Q. 1921? A. Yes. In Mandan. In his office. Q. Will you please state the substance of that conversation? A. Well, I told him—I see that case of mine is set for trial for, I think it was the 18th of October, and I said I did not know anything about that. Well, he said, I thought you were keeping in touch with it. No, I said, I left the matter up to you and thought that you would advise me when it would be necessary for me to be up here, and I said to him, what had we better do now. Well, he says, you had better get yourself some attorney and have him file affidavits of prejudice at the time of the district court and have the case put over to another county. . . . I got an attorney to draw up these affidavits—Thorstein Hyland. . . . I got a change of trial—the case was set to be tried in Mandan, Morton County. . . . Q. Did you have any conversation with Mr. Crum between the 18th of October and the time when the case came up at Mandan. A. I did. Q. Where? A. I met him on the street. Q. In what place? A. Mandan. Q. When was this and what conversation occurred at that time? A. I says to him—this thing

is getting to look pretty bad to me. I says that case has been set here at Mandan the 2nd of November, just a few days off, and I don't see where there is much chance of prolonging things much longer. Q. What did he say? A. He says, well it looks that way. This matter has been taken out of my hands and I cannot do anything about it. . . . Q. Did you appear at the time when your case was set on the 2nd of November in Mandan? A. Yes. . . . Q. Did you have any conversation with Mr. Crum as to what course you should pursue at the trial? A. Yes, I did. Q. Where and when did you have such conversation with him? A. That was at the same conversation that I had with him on the street there, at the same time I told him I was going to plead guilty. Q. And what did he say? A. Well, he said 'I would not do that. I would rather get out of the country.' I told him—I said, what about my bondsmen, those men who have been good enough to go my bond,—I said I would not do that. 'Well,' he said, 'you could pay them back some time.' . . . He suggested that I should go to Mexico. . . . When I told him that I would not do that and leave the country that I would plead guilty,—well he said that he would get me a light sentence,— he would see that I would get a light sentence, and then I should go down and serve awhile and he would get me out in a short time. Q. Did you have any talk with him after you had pled guilty. . . . A. I had a talk with him at the penitentiary at Bismarck. Q. How long after the time you pled guilty was that? A. I could not say,— I would judge a month. . . . Q. What was said at that conversation by either of you? A. I asked him what he was doing about getting me out of there. Well, he said he didn't think he could do anything right now. I told him he had better get busy. Well, he said he would do what he could. He would try and get me out as soon as he could. . . . I sent for him. . . . I was going to see what he was going to do about getting me out of there." The testimony in reference to Janzen getting a draft from his mother for five hundred dollars is corroborated by his brother-in-law, Julius Friesen, who went with him to the bank to identify him when the draft was cashed. Friesen also testified that he permitted him to use his name on the registered letter and that he saw him put the money into the envelope and address it to Charles L. Crum, Mandan, North Dakota.

Mrs. Janzen testified that she was with her husband when he mailed the letter. She also testified that she let her husband have $200, the proceeds of some furniture she sold at Hazen, that she saw Mr. Crum in November, 1921, and "I asked him how soon he could get Mr. Janzen out and he said he was working and he would get him out shortly. . . . About three weeks later I saw him at his office in Mandan. . . . I asked him if he got that money and he said 'yes, I did,' but he said that he wouldn't keep any of it. I told him I wanted it, and he said that he didn't have it; that he handed it over to somebody else, and I asked him who this somebody else was and he said it was none of my business, but that it was working for him. The next time I saw him I asked him for some of the money, I was destitute, and he said he told me before that he didn't have this money himself. . . . and he said 'if you need money that bad I will send you ten dollars when I get back to Mandan.' . . . He sent me ten dollars. . . ."

Charles L. Crum, the defendant, testifying in his own behalf, stated that he went to Hazen as assistant attorney general in charge of the bank case; that after he had been there an hour or so Mr. Janzen called him into a private room in the bank and told him all about different speculations, and everything he had done, that he was willing to sign a statement or confession. "Q. What was said? A. He asked me if I would keep him out of the penitentiary for ten thousand dollars. Q. What did you say? A. . . . it was substantially an offer to give me ten thousand if I would keep him out of the penitentiary. . . . I told him I wouldn't entertain any proposals of that kind. . . . I would treat him fair. . . . I wanted him to have his legal rights. . . . Some weeks after that he blew into my office at Mandan. . . . he would sit there and look at me, without saying a word; he would look at me till the silence would get painful; he looked like he wanted to say something to me and was reluctant to do so, and finally after he was sitting there for probably thirty minutes, or more, he asked me, he used these words, or these words in substance, I wouldn't attempt after five years to give the exact words, because I couldn't do it, but he asked me if I thought it would do him any good if he made a substantial contribution to the recall campaign fund. . . . I told him that I didn't know a thing about it, that I personally wasn't or

wouldn't have anything to do with anything of that kind." Some time later he said Janzen came to the house, "he just sat and looked at you until you would feel creepy, and the silence would get embarrassing and finally, . . . he told me that he had made up his mind to make a contribution to the recall campaign fund. . . . I told him I wouldn't accept money from him for any purpose on earth; . . . I wouldn't take it, if I knew it was coming indirectly from you I wouldn't have anything to do with it, and he left." Referring to the receipt of the money, Mr. Crum said: ". . . my recollection is, that is the best guess that I could make of the matter, would be sometime in June, 1921. . . . It came in a large envelope, registered, and was addressed to me, to Charles L. Crum; I think, attorney at law, Mandan, and it had the name—Julius Friesen. Q. There was nothing in the envelope except just currency? A. That was all, and my recollection is that it was in large denominations, there may have been some currency less than $100, but I think there were all one hundred dollar bills. And it had nothing in it but just currency, no letter of any kind. . . . I didn't know what to do with the money, I was stumped. . . . I put it in my pocket and took it home; I had a little safe in my house. I put it in the safe in the envelope and I kept it there for several weeks. . . . I realized of course that the money was not my money. I wasn't really entitled to it and I didn't really know what to do with it, and I was over here at Bismarck one day and they were very hard up for money for campaign purposes and I got to studying about the matter and I went home and got this money and brought it over and gave it to a fellow who I knew would use it in the campaign." (On cross-examination he stated that he gave the money to Harry Dunbar.) His best recollection was that he got the money in June, 1921 and that he saw Janzen twice before he went to the penitentiary and twice in the penitentiary. "He came to the office a number of times when I wasn't there, or at least that's what my son told me." When asked as to whether he was satisfied that the money came from Janzen he said: "No sir, . . . I had no positive proof. The name on the envelope, that is, the return card on the envelope, was entirely a stranger to me." He did not write to the man whose name appeared on the envelope and made no inquiry of any kind. He knew that Janzen was intending or had suggested making a campaign

contribution. He, Crum, occupied no official station with any political
organization and was not soliciting contributions. He was examined
with special reference to the purpose for which the money was to be
used as follows:

"Q. Now when Mr. Janzen suggested to you, as you say, that he might
make a campaign contribution to this recall campaign fund and when
he told you later that he had made up his mind to make such a con-
tribution, you, of course, knew the purpose for which he intended to
make that contribution, didn't you? A. Well I didn't think it would
be proper for me to have anything to do with it, Mr. Carr. Q. No,
but you had in your mind, of course, the purpose for which a man
under a charge of that kind and suggesting that he make a campaign
contribution, you know the purpose? A. Yes, usually. Q. When men
make a campaign contribution they expect something in return? A.
I am aware of that fact. . . . Q. Well, any way Mr. Crum, you
knew that when he suggested making a campaign contribution that his
purpose was to influence the course of justice in his particular case?
A. Well I thought that was his object, yes sir. Q. And when that money
was received and you suspicioned that it came from Janzen, you knew,
in your own mind, if it did come from him, that was the purpose
for which it was sent? A. Well yes, in a way, if it came from him.
Q. Why was it that you made no inquiry of the sender of that money
as to the purpose it was sent to you? A. Well there was no letter in
the envelope. There was no message from anyone. Q. Well it isn't
a usual thing for you to receive such sums of money as that without a
message? A. I thought if it wasn't from Mr. Janzen, I would hear
from somebody pretty soon or something would develop. Q. This
money was sent then apparently in accordance with the suggestion
which he made that he would make a campaign contribution fund.
A. Well I didn't know, Mr. Carr. Q. Well didn't you think that was
true? A. I had a suspicion to that effect, yes sir. But I had no
positive evidence that it had even come from Janzen in that way, other
than my suspicion. Q. You had received this money in the mail and
had met Janzen at least twice, why didn't you inquire of him relative
to the matter? A. Well I thought if he was interested in the matter
he would be the one that would inquire. I hadn't any particular reason,
as a matter of fact, I didn't want to have anything to do with Janzen.

Q. But you did not make any effort to find out exactly from where it came or the purpose, or make any effort to return it? A. No sir, I did not. Q. Now you saw Mrs. Janzen sometime later, after her husband was sent to the penitentiary? A. Yes. . . . she brought a little note from Mr. Jansen, requesting me to pay this money to her. Now when I met her here by the McKenzie Hotel, that was the second time. . . . I told her I didn't owe Mr. Janzen a cent. . . . Q. Now when you told her you hadn't received any money from Mr. Janzen, didn't she call your attention to the money she was referring to? A. I don't think she did, no. Q. Well as a matter of fact, you knew what money she was referring to? A. Well I had an idea, yes. Q. You didn't refer to the fact though and inform her that you had received this $700, from some one in Minneapolis? A. No. Q. Didn't tell her anything about that? A. No. Q. Although at the time you knew this was the money she referred to. A. I had an idea it was. I didn't absolutely know, Mr. Carr. Q. Well you didn't take the trouble to inquire as to whether that was the money? A. No. Q. She was referring to? A. No. Q. What did you say? A. I just told her I had never received any money from Mr. Janzen, I didn't owe him anything and that, therefore, I couldn't comply with her request. . . . Q. And she again asked you for some money? A. Well yes. She asked me for a loan. Q. She used the word "loan" did she? A. Yes sir. She said she was broke. Her husband was in the penitentiary and she had no place to stay and nothing to eat and no clothes for her little girl, and wanted me to loan her a little money until she could get a job and could make some money so that she could take care of herself. . . . She told me she come over to get the, or her, $700 her husband had paid me to keep him out of the penitentiary. I told her that was a falsehood, that was not true. Q. But at the time that you told her that you did have a suspicion in your mind that this money had come through Mr. Janzen? A. Yes. . . . "I didn't want to send Mrs. Janzen a check or write her a letter. I put the money in an envelope and mailed it to her. It was twenty-five dollars, and not ten dollars as stated by Mrs. Janzen. I never told Mr. Lemke (the Attorney General) that Janzen had offered $10,000 or had made a campaign contribution of $700."

Mr. Crum and Janzen agree that there was something said about

immunity to Janzen at their first meeting at Hazen, North Dakota. Janzen claims that Crum said he was fortunate that Crum had been appointed on the case as somebody else might come up there and raise Cain, that he (Janzen) need not worry, things would come out all right; while Mr. Crum claims that Janzen took him into a room in the bank, told him all of his troubles and offered him $10,000 to keep him out of the pen. Both agree that there was a bribery proposal —Crum claiming that at the meeting in the room in the bank at Hazen, Janzen offered $10,000; Janzen claiming that at the meeting in Crum's office in Mandan Crum said that it would take $2,000, and on being told that he could not raise $2,000, Crum said to raise and send him what he could. They agree that an envelope containing seven one hundred dollar bills was sent by registered mail from Minneapolis to C. L. Crum, Mandan, North Dakota, and on the return portion of the envelope was the name of Julius Friesen. Mr. Crum admits that he received such an envelope, so addressed, which contained $700 in currency. He denies that he told Janzen not to write any letter or check, but to send him the money in an envelope without his (Janzen's) name attached to it in any manner; but Mr. Crum says he sent twenty-five dollars to Mrs. Janzen, that he did not write a check nor a letter, but sent the currency in an envelope, just as Janzen sent the money to him.

There is a dispute over the sending of the money. Janzen says that it was to go to Crum to influence him in the prosecution of the case. Crum says that Janzen first asked him if it would help him if he made a contribution to the recall campaign fund; that sometime later he came to the house and said he had decided to make a contribution to the recall campaign fund, and shortly thereafter, he received the money, he states, in June, 1921. He admits that he knew the purpose of the suggested campaign contribution was to influence the course of justice in the Janzen case; that he had a suspicion that the money came from Janzen, and knew that if it did come from him it was sent for that purpose. He made no inquiry and thought that if it wasn't from Janzen he would hear from somebody pretty soon, or something would develop. This is equivalent to saying that if Janzen sent the money he would not write, for Crum would know the purpose for which it was sent; but if it was sent by some one

else he would have heard from that some one, and not hearing from some one else he turned the money over to one Harry Dunbar, as a campaign contribution as per agreement with Janzen. He admits he met Janzen at least twice after he received the money, but he never made any inquiry of him; that he never made any effort to find out where the money came from, or the purpose for which it was sent, or any effort to return it. Janzen claims that when he met Crum after sending the money he asked him if he had received it, and he said, yes, and it is working for you. Crum denies this statement which appears in the deposition of Janzen, taken in the city of Minneapolis on the 23rd day of October 1926. On the 21st day of October 1926, just three days earlier, Mrs. Janzen's deposition was taken in the city of Los Angeles, California and she makes the statement therein, that she asked Mr. Crum if he got that money and he said, yes, that he didn't keep any of it, but that it was working for him, meaning her husband. He denies this statement made by Mrs. Janzen, denies that Janzen ever asked him if he had received the money, admits that Mrs. Janzen did ask him if he received the money, but denies that he ever admitted to Mrs. Janzen that he received it. He says he told her that he never received any money from her husband; that he didn't owe her husband a penny, but at the same time he says he had a suspicion, an idea, that the money he received came from Janzen. He knew that he got $700 that didn't belong to him. He knew that no one had promised to send him any money but Janzen who he admits had promised a campaign contribution. Without further suggestion from anybody he says he turned the money over to Dunbar to use in the campaign. He is not relieved from his responsibility as an attorney and public official by his claim that he turned this money over for campaign purposes. From his admissions he must have known it was sent to him to purchase immunity for Janzen and by turning it over, as he claims, to be used as Janzen intended, he manifested either a willingness to further the corrupt purposes of the donor or a dishonest purpose to defraud him. If Mr. Crum was "stumped" or if he had entertained the slightest doubt as to his duty in the premises, it is strange that he did not consult his superior.

If it is true that Janzen called him into a room in the bank at Hazen and offered him $10,000 to keep him out of the penitentiary,

it was his duty to administer such a rebuke that Janzen would never again attempt to corrupt a public official, much less Mr. Crum. Did he do it? No, for if he had Janzen would not have come to his office in Mandan and attempt to bribe him with a campaign contribution, nor would he have made good in the attempt by sending him $700 by registered mail.

From this record it appears that Mr. Janzen had no other attorney than Crum, until Mr. Hyland was employed to secure a change of venue from the county.

Janzen and Crum agree that Janzen came to Crum's office in Mandan, and Mr. Crum says he came there two or three times in his absence. Janzen was not represented by an attorney at the preliminary, he appeared personally and waived examination.

Mr. Crum's statements that Janzen called him, an assistant attorney general, into a room, disclosed to him the entire case against himself, that he offered him $10,000 to keep him out of the penitentiary, that Mr. Crum told him he couldn't consider any such proposition, and Janzen persisted in coming to his office trying and trying to bribe him, seems unreasonable. On the other hand, if Crum said to Janzen "you are fortunate in having me instead of someone who would come up here and raise Cain, you need not worry about it, everything will come out all right, there will have to be a complaint but I will take care of that, you need not worry about it," such language is perfectly consistent with Janzen's conduct in going to see Crum, seeking his advice at his office, and even in his home, as Mr. Crum admits. It is clear from the testimony of both Crum and Janzen that a bribe was offered to Crum as an assistant attorney general for immunity to Janzen, and was accepted.

If it was accepted as a campaign contribution it was, nevertheless, bribery. It is not the use to which the money was put, but the purpose for which it was paid, and Mr. Crum says he knew that if Janzen sent it, that it was intended to influence the course of justice in his case. Mr. Crum's testimony fully sustains the findings and conclusions of the referees.

There is no merit to the contention advanced that this proceeding is irregular because the original investigation was not initiated upon an affidavit by the complaining party. It is not necessary for us to

consider the circumstances in which this court would be warranted in ordering an investigation of the conduct of an attorney upon its own initiative, for we have in this case at the foundation of the proceedings the sworn complaint in the civil action of Mrs. Janzen against the respondent. This complaint was of such character, especially when a demurrer was interposed by the defendant, that a prima facie case of wrongful conduct was apparent. It should be obvious that the facts thus presented, of necessity, imposed upon this court the duty to order an investigation and that the foundation for jurisdiction of any proceedings that might be warranted upon such investigation was present. The prosecution was, of course, upon formal charges duly verified.

Some of the prominent lawyers of the state appeared upon the hearing and appealed to this court for leniency for Mr. Crum upon the ground that in all their practice with Mr. Crum he had been ethical, courteous, and always fair in the practice of his profession, and such has been Mr. Crum's practice in this court.

Mr. Crum is now fifty-four years of age. He is not in very good health, he has no other profession, and there is nothing that he can turn his hand to outside the practice of law to make a living. We have taken into consideration everything that the lawyers have said in his behalf, his age, his helplessness, if he is entirely deprived of the right to practice his profession, and the fact that the offense was committed more than six years ago, and we are constrained to extend leniency to Mr. Crum. It is therefore the judgment of this court that the said C. L. Crum be and is hereby suspended from all practice of the profession of attorney at law for a period of six months from the twenty-seventh day of September, 1927.

BIRDZELL, Ch. J., and CHRISTIANSON, J., KNEESHAW, and ENGLERT, Dist. JJ., concur.

NUESSLE and BURR, JJ., did not participate; Honorable W. J. KNEESHAW, Judge of the Second Judicial District, and Honorable M. J. ENGLERT, Judge of the First Judicial District, sitting in their stead.